## Cinci et ux. v. Fort Mason Coal Mining Company

*Anthony Cavalcante*, for plaintiffs.

*Phillips, Waggoner, Phillips & Board*, for defendant.

Carr, P. J., October 7, 1952.—This is a proceeding by petition and rule to open a judgment in ejectment entered by confession against a lessee for certain alleged breaches of covenant.

On October 22, 1947, Serafino Cinci and Fannie Cinci, his wife, mine-leased to Fort Mason Coal Mining Company, a Pennsylvania corporation, a tract of Sewickley coal in Nicholson Township in this county for a period of 10 years, subject to stipulated minimum royalties during each calendar year. The lease provides as follows:

"Royalties for all coal mined and removed during each calendar month shall be paid for on or before the 25th day of the following month . . .

"The lessee agrees to furnish the said lessors, on or before the 25th of each calendar month, a statement in writing showing the quantity of coal mined and removed from said premises during the preceding monthly period. Said statements shall show the quantity of coal mined and removed during each monthly period and the royalty due thereon from the lessee to the lessors . . .

"The said lessee covenants and agrees that it will at all times during the term of this lease keep and maintain at its office upon the premises an accurate record and statement in writing by the day and month of all the coal so mined and removed from said premises . . .

"The lessee further covenants and agrees that it will not mortgage, nor assign, convey, lease, or sublet the estate hereby created or any rights hereunder to any person or persons whomsoever, without the writ-

ten consent of the lessors first had and obtained . . .

"Any request or notice which either party hereto may desire to give hereunder to the other shall be properly served upon the other party only when reduced to writing, placed in an envelope, sealed, stamped, registered and deposited in any United States Post Office, addressed as follows: Serafino Cinci, Masontown, Pa.; Fort Mason Coal Mining Co., Inc., Masontown, Pa. . . .

"If the lessee shall at any time fail to perform or observe any of the covenants, terms, or agreements hereinbefore contained . . . the lessors may, at their option, enter judgment against the lessee in any amicable action or actions of ejectment . . . and for the entering of such judgment this shall be a warrant to any attorney, provided, however, that the lessors shall not invoke any of the remedies in this paragraph contained nor forfeit this lease unless and until the lessors shall have given to the lessee ten (10) days notice in writing, setting forth therein specifically the nature of such default, and during said ten (10) days period the lessee shall have the right to correct such default."

On March 27, 1952, when the judgment was entered, the lessors filed an affidavit of default in which they averred: (1) That the lessee had failed to pay royalties accrued between January 1, 1951, and July 31, 1951, in the amount of $45.12; (2) that it had failed to furnish to the lessors on or before the twenty-fifth of each calendar month the required statement of the quantity of coal mined and removed from the premises during the preceding monthly period; (3) that it had failed to keep and maintain in its office upon the premises an accurate record and statement in writing by the day and month of all coal mined and removed; (4) that it had assigned or sublet the

estate without written consent of the lessors, and (5) that the lessors had given due and proper written notice of such defaults, notwithstanding which the lessee had failed to correct them.

The testimony taken on the rule discloses no material issue of fact. The property involved consists of a deep mine that at the date of the lease had already been opened and equipped with machinery, tracks, cars, and a tipple. For the equipment the lessee paid the lessors $5,000. It has also invested more than $19,000 in the development of the mine, and has paid the lessors approximately $20,000 in royalties, though as yet the operation has yielded no profit. The coal is of the five-foot Sewickley vein, which has a high sulphur content and enjoys but a limited and irregular market.

It appears that the deficiency of $45.12 in the payment of accrued royalties totalling $1,025.78 during the first seven months of 1951, as averred in the affidavit of default, resulted from a mere error of calculation. It was not even called to the attention of the lessee until January 3, 1952, and then only informally in a letter written by the lessors' accountant and addressed personally to William A. Barnes, vice president of the company, with a request that he check the figures with its own accountants. He proceeded to do so at once, and when the error was found, the deficiency was made good, payment having been made in full on April 1, 1952. There is not now any balance of royalties due to the lessors, and none is claimed.

The only formal notice of default ever given to the lessee as prescribed by the terms of the lease was contained in a letter signed by counsel for the lessors and dated August 14, 1951, in which he accused the lessee of assigning the lease or subletting the mine to the Cat Run Coal Company, and demanded an account of

all coal mined from the premises since the date of the lease.

The facts relied on to show a breach of the covenant against assigning and subletting are these. Having been losing about $2 a ton during a protracted period of depression in the market for Sewickley coal, the company in 1951 committed the management of the mine, including sales, to William A. Barnes, its vice president, who owns one third of its stock and is a certified mine foreman, agreeing to pay him for his services whatever he could make the mine to earn, if anything, over and above the royalties accruing to the lessors. It did not, however, surrender supervision; the other stockholders met regularly with him to confer, and from time to time inspected the mine. He was then and still is managing another mining operation owned by his family and known as the Cat Run Coal Company, which has a battery of coke ovens at Brier Hill, nearby, and to that company he has been selling some of the Cinci high sulphur coal for use in combination with coals of better quality in making coke. He has also been able to sell some of the coal to the trade by mixing it with Cat Run and other coals. Although the volume of business being done is not large, he has maintained the mine to the satisfaction of the company and provided the necessary funds for the payment of the accruing royalties. The books and records of his transactions are kept by accountants employed by the company. The agreement between him and the company is entirely oral and without any fixed duration.

In our opinion the agreement with Barnes constitutes neither an assignment nor a sublease, but a contract of employment, terminable at will. No estate in the premises has in any way been transferred to him or any other person. Even the equipment of the mine

continues to belong to the company. He is merely an agent, whose compensation is measured by the earnings of the company, in which, of course, the lessors have no interest: Cf. Waterville v. Kelleher, 127 Me. 32, 141 Atl. 70. The result is no different from what it would have been if the other stockholders had sold their shares to him, which the lease does not prohibit: Swartz v. Bixler et al., 261 Pa. 282. Indeed, the contention here made by the lessors seems to us unreasonable in the extreme. Instead of being hurt, they have been benefited; the mine has been preserved by safe and efficient operation, and they have continued to enjoy their income despite the virtual collapse of the market for low grade coal.

As to the demand for an accumulative account of all coal mined since the date of the lease, it is to be seen that there is no provision in the lease requiring the lessee to furnish anything more than the regular monthly statements. The lessee has, nevertheless, had the accountants go back over its books to August 15, 1951, when the controversy arose, and give to the lessors a transcript of all sales, showing the names of the purchasers, the billings, the amounts received, and the dates on which the deposits were made. It has revealed to the lessors the name of the bank in which the deposits were made, and given them a full statement of the manner in which the sales are being handled. No complaint has been made to us that the statement is inaccurate or that it is in any respect unsatisfactory.

We think it clear, therefore, that the attempted forfeiture is wholly arbitrary, and that to permit it to stand would be unconscionable. See Willock's Estate, 165 Pa. 522; Myers et al. v. Ohio-Penn Gas & Oil Co., 294 Pa. 212. Accordingly, there being no question of fact to be determined, the rule to open the judgment will be treated as one to strike it off.